UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TERRANCE AGOSTINI,

                                              Plaintiff,

-vs-

T. BACKUS, Correction Officer,
D. VICTOR, Correction Officer,

                                     Defendants.

DECISION and
ORDER

14-CV-6188 CJS

_____

INTRODUCTION

Terrance Agostini ("Agostini" or "Plaintiff") is an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") who maintains that Defendants, who were employed by DOCCS, violated his rights under the First Amendment to the United States Constitution by retaliating against him for engaging in protected activity. Now before the Court is Defendants' motion (Docket No. [#42]) for summary judgment. The application is granted in part and denied in part.

BACKGROUND

At all relevant times Plaintiff was housed at Attica Correctional Facility ("Attica") in the "D Honor Block." The Defendants, Corrections Officer Victor and Corrections Officer Backus, both worked in D Block. Prior to October 2013, Plaintiff had a job assignment as "D-Block Honor Clerk." However, on or about October 4, 2013, Victor fired Plaintiff from that position. In particular, Plaintiff indicates that in his capacity as D-Block Honor Clerk, he was speaking to an inmate "feed-up porter" about the latter's failure to provide the correct amount of milk to the

1

Honor Block.  As Plaintiff was having this discussion with the feed-up porter, Defendant

Corrections Officer Victor came upon the scene and, according to Plaintiff, misinterpreted what

was happening:

> On or about 10/4/2013, Plaintiff was removed from the D-Block clerk job due to an incident involving another inmate (Lister #08b1716), who is the feed-up porter for D-Block. Plaintiff and Lister were having a cordial discussion to correct the milk count for Honor Block.  As Plaintiff stated to Lister, 'the Honor Block has been short milks so you make sure there is 20 milks for that side because they have been complaining."  At that very moment, Defendant Victor enters the area entrance and tells plaintiff, "Fucking asshole, you're fired!"  Plaintiff made an attempt to clarify what was really transpiring with Lister, however, Defendant Victor states, "I don't want to hear it and I'll make sure you never get another job again!"  Defendant Backus then ordered plaintiff to "take it back upstairs, your days [in D Block] are numbered," and Plaintiff complied.[1]
>
> [Later that same day,] Plaintiff was served with a Counsel Reprimand by Defendant Victor which reasons states: ["]Interfering with feed-up.["]  Again, at that moment Plaintiff made another attempt to explain what transpired with Lister and Defendant Victor simply cut Plaintiff off and stated, "I don't give a fuck, you're out of here (meaning Honor Block) in 30 days if you can't find a job[,] and I'll make sure you don't."  In response, Plaintiff said, "You can't do that, I'll tell the Sergeant."  Defendant Victor replied, "Do that and you're going to the box (punitive segregation)."
>
> Later that morning while Plaintiff reported to the lobby to receive a flu shot, Plaintiff was threatened by Defendants while walking through the lobby.  Defendant D. Victor tells Defendant T. Backus, "He said he'll tell the Sergeant," [and] Defendant T. Backus replied, "If he snitches to the Sergeant and gets a job we'll get rid of him our way," all the while looking at Plaintiff[.]

Amended Complaint [#5] at pp. 3-4.

As the foregoing paragraphs suggest, Plaintiff wanted to continue living in the D Honor

Block, but he needed to have a job or program assignment in order to do so.  Plaintiff therefore

---

[1] As corroboration for this version of events, Plaintiff has submitted an affidavit from inmate Marvin Vassar, which states in pertinent part:  "I was a witness to and overheard the following take place on October 4th, 2013, Friday, at approximately 7:45 am.  :  Officer D. Victor tells inmate Agostini #98A7145 "You're fired for pushing up on the feed-up porters," and "You'll never work again."  Officer T. Backus then proceeded to tell inmate Agostini #98A7145, "Your days in honor block are numbered, take it upstairs." Docket No. [#1] at p. 24.

attempted to obtain a position as a clerk for the facility Veterans' Administration ("VA") Program, of which Sergeant Schieffer ("Schieffer") was the "Staff Advisor/Program Supervisor."[2] In that regard, on October 6, 2013, Plaintiff wrote to Sergeant Schieffer about his predicament, as follows:

> Re: Issues in D-Block
>
> I am requesting some assistance if not direct intervention. I was fired from the D—Clerk job and threatened by the Hall Capt. And Side-man relief. They are attempting to have me expelled from honor housing through no fault of my own; by not having a job/program.
>
> I am requesting a V.A. job from you, so I may stay in honor housing. Thank you.

Docket No. [#1] at p. 30. According to Plaintiff, Sgt. Schieffer attempted to help him obtain the VA clerk's job, but "D Block," apparently meaning Victor and Backus, pressured others involved in the hiring process not to hire him.

Nevertheless, on or about October 20, 2013, Plaintiff obtained a new job assignment, in the facility metal shop. According to Plaintiff, Sergeant Schieffer arranged the assignment "to save [his] butt in honor block," meaning that Schieffer arranged the job so that Plaintiff could continue living in the Honor Block.[3] Plaintiff, though, contends that the metal shop assignment was just a "placeholder" to allow him to remain in D Block, and that Sergeant Schieffer apparently did not intend for him to actually report to the metal shop, since he never received any notification that he was supposed to report to the metal shop. In that regard, Plaintiff explains that inmates only report to locations when they are told to do so, and he was never told to report to the metal shop.

Meanwhile, Plaintiff, who had no interest in working at the metal shop, continued looking

---

[2] Docket No. [#1] at p. 28.
[3] Amended Complaint at ¶ 23; Pl. Deposition at p. 41 ("I knew that I would never report to metal shop. It was just to stop the clock, that 30 day deadline to cut that off so I didn't get kicked out of the block.")

for a different job/program assignment, and eventually obtained a job as a clerk in the facility's "Transitional Service Center." Plaintiff indicates that on November 1, 2013, he was hired to work at the Transitional Service Center by Counselor Wing ("Wing"). Plaintiff further maintains that on or about November 4, 2013, Sgt. Schieffer authorized him to switch his program from the metal shop to the "Transitional Service Center."[4] Plaintiff has further submitted what purports to be a handwritten note from Sgt. Schieffer, indicating that he had notified the civilian employee responsible for keeping track of inmate job assignments, Supervising Offender Rehabilitation Counselor Shiffer ("SORC Shiffer"), about the change in assignment.[5] Subsequently, there was a period of approximately nineteen days before Plaintiff was directed to report to his job at the Transitional Service Center.[6] During that period, Plaintiff was not reporting to the metal shop or the Transitional Service Center. [7]

During this time frame, on or about November 15, 2013, Defendant Backus claims that he observed Plaintiff in the D Block yard, which aroused his suspicion because he believed, based upon facility records, that Plaintiff was assigned to the metal shop. According to Backus, he contacted the metal shop and spoke to Corrections Officer Kochmanski ("Kochmanski"), to inquire why Plaintiff was in D Block at that time of day, instead of at the metal shop. Kochmanski reportedly told Backus that Plaintiff was supposed to be at the metal shop, but that Plaintiff had told a civilian employee at the metal shop that he was not required to report to the metal shop because he was beginning a different job. Backus then claims to have contacted SORC Shiffer, the Chairman of the Program Committee, and asked him whether or not Plaintiff was still assigned to work in the metal shop, to which Shiffer answered in the affirmative. Whereupon,

---

[4] Amended Complaint at ¶ 29 & p. 40.
[5] See, Complaint [#1] at p. 38, Exhibit I.
[6] Pl. Deposition at p. 44.
[7] Amended Complaint at ¶ 30.

on or about November 16, 2013, Backus and Victor issued a misbehavior report to Plaintiff, for, *inter alia*, failing to report to the metal shop.

On November 19, 2013, a disciplinary hearing was conducted concerning the misbehavior report. The transcript of the disciplinary hearing is not part of the record. However, Plaintiff maintained at the hearing that he was not guilty of the charges, since he was not assigned to work in the metal shop at the time of the misbehavior report. At the conclusion of the hearing, the hearing officer dismissed the misbehavior report, purportedly because he found that that there had been a legitimate misunderstanding as to whether Plaintiff needed to report to the metal shop. In that regard, the hearing officer's decision indicates that he had a telephone conversation with SORC Shiffer, which "cleared up" the "miscommunication."[8]

Plaintiff, though, maintains that there was no such misunderstanding, and that the misbehavior report was simply false and retaliatory. For example, Plaintiff denies that he was ever in the D Block yard on November 15, 2013, contrary to what Defendant Backus claims, and he also denies that he ever spoke with anyone at the metal shop. Plaintiff also contends that SORC Shiffer would not have told Backus on November 15, 2013, that Plaintiff was assigned to metal shop, since Sgt. Schieffer had notified Shiffer of the change in assignment two weeks earlier. Plaintiff also maintains, and Defendants agree, that no paperwork exists showing that Plaintiff was ever directed to report to the metal shop on November 15, 2013. Further, Plaintiff maintains that the hearing officer told him that the misbehavior report was bogus, and that the hearing officer made up the "miscommunication" rationale simply to make the matter "go away" quietly.

---

[8] Docket No. [#42-4] at p. 6.

Shortly after the dismissal of the disciplinary charges, Plaintiff began his new assignment as clerk in the facility Transitional Service Center. A corrections officer, Officer Kingsbury ("Kingsbury"), was stationed at the entrance of the Transitional Service Center, and it is undisputed that all inmates, including Plaintiff, were required to notify Kingsbury whenever they left the Center.

On December 10, 2013, the afternoon program at the Transitional Service Center was canceled, and Plaintiff was given permission by his civilian supervisor, Counselor Wing, to leave early. There is no indication, however, that Officer Kingsbury was aware that Counselor Wing had given Plaintiff such permission. As Plaintiff left the Transitional Service Center he passed by Kingsbury, as part of a group of other inmates who were leaving at that time. According to Kingsbury, he saw the group pass by, but did not specifically see Plaintiff, and assumed that the entire group consisted of inmates who had finished their Aggression Replacement Training ("ART") course for that day.[9] Plaintiff contends that as he passed Kingsbury's station on the date in question, he said words to the effect of, "I will be going for the day I will see you tomorrow," but admits that he did not explain to Kingsbury that he was leaving earlier than usual.[10] Kingsbury later received a telephone call from Defendant Backus, inquiring whether Kingsbury had given Plaintiff permission to leave the Transitional Service Center early. Upon learning that Plaintiff had left the Transitional Service Center without specifically notifying him, Kingsbury issued Plaintiff a misbehavior report for leaving an assigned area without permission.[11]

At the disciplinary hearing, Counselor Wing indicated that although he had given Plaintiff

---

[9] Docket No. [#42-5] at p. 16.

[10] Docket No. [#42-5] at pp. 14 ("I never asked him for permission I never explained to Kingsbury my class is cancelled. Mr. Wing gave me permission to go back um if that is the procedure I was unaware that I had to after once I cleared it with Wing that I could just go to the desk and you know . . ."), 19

[11] See, Docket No. [#30] at p. 9. In pertinent part, the misbehavior report stated: "Inmate Agostini #98A7145 left Transitional Services without notification . All Transitional Service workers are required to notify the 1st officer upon leaving the area for the day."

permission to leave, it was policy for inmates to also check with Kingsbury before leaving the

Transitional Service Center.[12] Plaintiff essentially told the hearing officer that he had assumed

he had been free to leave the Transitional Service Center, since Wing had given him permission

to go and Kingsbury had not said anything to him as he left. The hearing officer, though, found

Plaintiff guilty and imposed a sentence of nine days in keeplock.[13]

On April 18, 2014, Plaintiff commenced this action proceeding *pro se.* In pertinent part,

the Complaint alleges that Defendants committed two separate acts of retaliation,[14] both

involving the issuance of false misbehavior reports. First, Plaintiff contends that the misbehavior

report issued by Defendants on November 16, 2013, was false and issued in retaliation for

protected activity, which consisted of him "alerting Sergeant Schieffer and receiving his help."[15]

Second, Plaintiff contends that Defendants caused Kingsbury to issue the second misbehavior

report to him on December 10, 2013, in retaliation for grievances that Plaintiff had filed against

Defendants.

Following the completion of discovery, on August 19, 2016, Defendants filed the subject

motion for summary judgment.[16] With regard to the misbehavior report issued on November 16,

2013, Defendants contend that they are entitled to summary judgment for two reasons: First,

they contend that they had no retaliatory intent for issuing the misbehavior report, and that they

merely relied upon what they were told by SORC Schiffer; and second, they contend that Plaintiff

---

[12] Docket No. [#42-5] at pp. 13-14 ("[T]hey [inmates] are suppose to check in with both of us, ah, mostly they can ask me but um they should be checked in with the officers.").

[13] Docket No. [#42-5] at p. 28.

[14] The Complaint originally set forth additional claims, but the Court dismissed all but the two retaliation claims. See, Decision and Order [#18].

[15] See, Pl. Opposition to Summary Judgment, Docket No. [#43-1] at p. 4 ("Plaintiff has indeed showed a causal connection between the protected speech (alerting Sergeant Schieffer and receiving his help) and Defendants action due to that assistance from Sergeant Schieffer.") For purposes of the subject motion, Defendants are apparently conceding that this qualifies as protected activity.

[16] Defendants filed an *Irby* notice as required by Local Rule 56.2. *See,* Docket No. [#42-2].

cannot establish a causal nexus between the protected activity and the misbehavior report, since, based on what SORC Shiffer told them, they would have taken the same action without regard to the protected activity. As for the December 10, 2013, misbehavior report, Defendants contend that Plaintiff failed to exhaust his administrative remedies as to that claim as required by 42 U.S.C. § 1997e(a), and that in any event they were not involved in Officer Kingsbury's decision to issue the misbehavior report. Backus further asserts that his act of calling Kingsbury to ask whether he had given Plaintiff permission to leave the Transitional Service Center early was not an adverse retaliatory act.

In response to Defendants' motion, Plaintiff contends first that there are triable issues of fact concerning the November 16, 2013, misbehavior report and Defendants' retaliatory intent in issuing the report. For example, he maintains that Defendants' version of events is disputed both by his own testimony and by the lack of any evidence indicating that he was ever directed to report to the metal shop on November 15, 2013.

As for the December 10, 2013, misbehavior report, Plaintiff admits that he has no direct evidence of a connection between the issuance of the report and his protected activity, but asserts alternately that there is "strong circumstantial evidence of a connection between the acts,"[17] and that "at the very least Defendants' [sic] interaction with Officer Kingsbury polluted the scenario."[18] Plaintiff also contends that Defendants made verbal threats to him as he was returning to D Block from the Transitional Service Center that day, which suggests that they instigated Kingsbury's issuance of the misbehavior report.[19]

---

[17] Docket No. [#46] at p. 1.
[18] Docket No. [#43-1] at p. 4. There is no indication that Defendant Victor had any communication with Kingsbury concerning Plaintiff's activities that day.
[19] Docket No. [#43-4] at p. 1, Breault Declaration.

As for Defendant's contention that Plaintiff failed to exhaust his administrative remedies concerning the December 10, 2013, misbehavior report, Plaintiff admits that he "did not file a grievance in relation to the second ticket."[20]  However, Plaintiff indicates that he did not file a grievance both because he was "disheartened and fearful from the occurrences that transpired," and because he "felt in general that the second ticket was an extension of the ongoing pattern of threats and actions made by defendants."[21]

APPLICABLE LEGAL PRINCIPLES

<u>Plaintiff's *Pro Se* Status</u>

Since Plaintiff is proceeding *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

<u>Rule 56</u>

Defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56.  Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo*

---

[20] Docket No. [#46] at p. 1.
[21] Docket No. [#46] at p. 4.

*v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

<u>Section 1983</u>

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles generally applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right.

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir.2004) (citation omitted).

<u>Issuing A False Misbehavior Report, By Itself,  Is Not A Constitutional Violation</u>

It is clear that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report.  There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citations omitted).

First Amendment Retaliation

The general legal principles governing First Amendment retaliation claims of the type alleged here are clear:

> To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action. An inmate bears the burden of showing that the protected conduct was a substantial or motivating factor in the prison officials' disciplinary decision. The defendant official then bears the burden of establishing that the disciplinary action would have occurred even absent the retaliatory motivation, which he may satisfy by showing that the inmate committed the prohibited conduct charged in the misbehavior report.

*Holland v. Goord*, 758 F.3d 215, 225–26 (2d Cir. 2014) (citations and internal quotation marks omitted); *see also, Murray v. Hulihan*, 436 F. App'x 22, 23 (2d Cir. Aug. 30, 2011) ("Defendants cannot be liable for First Amendment retaliation if they would have taken the adverse action even in the absence of the protected conduct.").

Exhaustion of Administrative Remedies

A prison inmate is required to exhaust his administrative remedies *before* bringing an action in federal court complaining about prison conditions. *See*, 42 U.S.C.A. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").

For purposes of 42 U.S.C. § 1997e(a), New York inmates in the custody of DOCCS are required to pursue their administrative grievances using New York's Inmate Grievance Program:

> As an inmate of the New York State Department of Corrections and Community Supervision ("DOCCS"), Plaintiff was required to submit his grievances through the New York DOCCS' Inmate Grievance Program ("IGP"). The IGP has a three-tiered process for adjudicating complaints: "(1) the prisoner files a grievance with the Inmate Grievance

11

Resolution Committee ('IGRC'), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Office Review Committee ('CORC')." *Espinal v. Goord*, 558 F.3d 119, 125 (2d Cir.2009) (citing 7 N.Y. Comp.Codes R. & Regs. § 701.7 (1999)).

*Dabney v. Pegano*, 604 F. App'x 1, 3 (2d Cir. Feb. 1, 2015). However, despite this general requirement,

> [p]risoners are exempt from the exhaustion requirement when administrative remedies are unavailable. An administrative procedure is unavailable when (1) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is so opaque that it becomes, practically speaking, incapable of use; or (3) prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Amaker v. Bradt*, 745 F. App'x 412 (2d Cir. Dec. 19, 2018) (citations and internal quotation marks omitted).

If administrative remedies were "available" to the inmate plaintiff, then he must have "properly" exhausted his remedies:

> Proper exhaustion demands compliance with a prison grievance system's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.

*Williams v. Correction Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90-91, 126 S.Ct. 2378 (2006), internal quotation marks omitted).

DISCUSSION

The Court finds that Defendants' summary judgment motion must be denied with regard to the first alleged instance of retaliation, involving the November 16, 2013, misbehavior report. Plaintiff has demonstrated the existence of triable issues of fact concerning Defendant's intent in issuing the misbehavior report. Defendants maintain that they merely relied upon what SORC Shiffer told Defendant Backus on November 15, 2013, and they further contend that Plaintiff

12

cannot create a triable issue of fact on this point, since he has no personal knowledge about what SORC Shiffer said. In that regard, Defendants presumably maintain that SORC Shiffer's out-of-court statement is not hearsay, since it is being offered not for its truth, but for the fact that it was made. However, the Court finds that Plaintiff has raised a triable issue of fact as to whether Shiffer actually made the statement. Specifically, Plaintiff has submitted evidence that Shiffer would not have made the statement attributed to him by Defendants, since Shiffer knew that Sgt. Schieffer had approved Plaintiff for his new assignment with the Transitional Service Center. Consequently, this aspect of Defendants' motion is denied.

However, Defendants' motion is granted with regard to the second alleged incident of retaliation, involving the misbehavior report written on December 10, 2013, by Officer Kingsbury. Significantly, Plaintiff has not raised a triable issue of fact as to whether this second misbehavior report was false. At most, Plaintiff has shown that as far as he was concerned, it appeared that Kingsbury was aware that he was leaving early from the Transitional Service Center. It is undisputed, however, that Plaintiff did not actually have Kingsbury's express permission to leave the area.

Further, even assuming that Plaintiff could demonstrate that the misbehavior report was wrongly issued, he has not demonstrated that Defendants were personally involved in such issuance. There is no evidence whatsoever that Victor was involved. As for Backus, Plaintiff has shown only that he telephoned Kingsbury to check whether Plaintiff had permission to leave the Transitional Service Center and return to D Block. That Backus would make such a call is hardly surprising, or indicative of retaliatory intent, since Plaintiff admits that it was unusual for him to have been excused early from the Transitional Service Center. Indeed, Counselor Wing only gave Plaintiff permission to leave early that day because a program had been cancelled,

and there is no indication that Backus was made aware of such cancellation. Nor has Plaintiff otherwise raised a triable issue of fact as to whether Defendants actually caused Kingsbury to issue the misbehavior report as a form of retaliation.

Alternatively, the Court also agrees with Defendants that Plaintiff failed to exhaust his administrative remedies with regard to the second alleged incident of retaliation. In that regard, Plaintiff suggests that he decided not to file a grievance over the matter because he had a general fear of Defendants. However, that argument fails to show that administrative remedies were "unavailable" to Plaintiff, since it is undisputed that he filed other grievances involving Defendants at around the very same time.

Plaintiff, though, contends that he believed it was unnecessary to file another grievance, since he felt that Kingsbury's issuance of the misbehavior report on December 10, 2013, was merely the continuation of harassment about which he had already filed a grievance. However, the Court disagrees since the exception to the exhaustion requirement upon which Plaintiff attempts to rely "is necessarily limited to cases in which a prior grievance identifies a *specific* and *continuing* complaint that ultimately becomes the basis for a lawsuit." *White v. Velie*, 709 F.App'x 35, 37 (2d Cir. Sep. 15, 2017) (emphasis in original); *see also, Johnson v. Killian*, 680 F.3d 234, 238–39 (2d Cir. 2012) ("Johnson's 2005 grievance provided the prison administration with notice of, and an opportunity to resolve, the same problem that would continue intermittently through 2007. . . . [T]he issue that Johnson would have raised in 2007—the inadequacy of the spaces and times allotted for congregational prayer—was *identical* to the issue he exhausted in 2005. Accordingly, we now hold that Johnson's 2005 grievance was sufficient to exhaust his administrative remedies with respect to the continuing limitations on congregational prayer at FCI Otisville.") (emphasis added, footnote omitted). Here, the alleged acts of retaliation by

14

Defendants which prompted Plaintiff to file an earlier grievance are sufficiently distinct from the events of December 10, 2013, that Plaintiff was required to file a new grievance.

CONCLUSION

Defendants' motion [#42] for summary judgment is granted in part and denied in part. The application is granted as to the alleged retaliation on December 10, 2013, but is denied as to the alleged retaliation on November 16, 2013.

SO ORDERED.

Dated: Rochester, New York
      April  25, 2019

                ENTER:


                /s/ Charles J. Siragusa
                CHARLES J. SIRAGUSA
                United States District Judge